**Jeris E. BRAGAN**

v.

**Jack MORGAN, Warden.**

No. 3:89–0570.

United States District Court,
M.D. Tennessee,
Nashville Division.

April 17, 1992.

---

Thomas F. Bloom, Nashville, Tenn., for petitioner.

Linda A. Hammond, Office of the Atty. Gen., Nashville, Tenn., for respondent.

## MEMORANDUM

JOHN T. NIXON, Chief Judge.

Jeris Bragan has petitioned this Court for the writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging, inter alia, that the State violated the dictates of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), by failing to disclose a plea agreement between the State and the State's key witness, and by knowingly misleading the defense counsel and the jury through the use of perjured or inaccurate testimony at trial. For the reasons stated below, the Court finds that petitioner's Fourteenth Amendment guarantee to a fair trial was violated and therefore will grant the petition and order a new trial.

## BACKGROUND

On November 22, 1976, George Urice was found dead at the office of his Chattanooga, Tennessee private investigation firm. The police suspected foul play and on March 30, 1977, petitioner Jeris Bragan, Urice's business partner, was indicted for murder. However, the facts upon which this case turns involve another man, William Harold Torbett. Torbett, who would become the State's key witness, had been indicted in late 1976 for burglary and receiving and concealing stolen property. Attached to this latter charge was an habitual criminal count, a count which under Tennessee law carried with it a life sentence.

Negotiations between Torbett's attorney and the State proved fruitful. The State considered the stolen property count to be problematic and therefore agreed to drop that charge and the attached habitual criminal count. Torbett was to plead guilty to the burglary on February 25, 1977, but instead of appearing in the courtroom, Torbett fled the state. He was indicted on a charge of fraudulent breach of trust and was recaptured a month later.

In April, 1977, Torbett told police investigators that he had information concerning the Bragan case. He claimed to have refused $2500 Bragan had offered him to murder Urice. A few days after the murder, Torbett claimed to have seen Bragan at a bar at which time Bragan boasted of killing Urice. There was no doubt this information was crucial to the State's case and that Torbett would be a key witness for the prosecution. Torbett's purported reason for coming forward was his fear that Bragan would implicate him in the crime.

The Bragan trial was originally set for July 5, 1977. Torbett was to enter his plea on June 7th, but this was continued to July 13th. On July 3rd, the Bragan trial was continued to September 5th and on July 13th, Torbett's plea was continued until September 28, 1977. Torbett testified at the Bragan trial that he had made no arrangements with the State regarding his pending charges and that he still faced life imprisonment under the habitual criminal count. Bragan was convicted of first degree murder on September 15, 1977 and sentenced to a 99–year jail term. On October 18, 1977, Torbett entered the plea he claimed to have arranged with the State

prior to his escape nearly eight months earlier.

Bragan filed a motion for a new trial. The trial court held hearings in January, 1978, at which time defense counsel argued, inter alia, that Torbett had made a deal with the State and that the State had misled the defense and the jury in this regard. The trial court found no error and denied the motion. The Court of Criminal Appeals affirmed the conviction on January 18, 1979 and certiorari was denied by the Tennessee Supreme Court on April 9, 1979. The current petition for habeas corpus was filed on July 11, 1989 and counsel was appointed to represent petitioner. After numerous and thorough filings by both parties, and a Report and Recommendation from Magistrate Judge Sandidge, this Court held an evidentiary hearing addressing the sole question of the State's alleged *Brady* and *Giglio* violations.[1]

Petitioner's grounds for relief are based upon two claims: (1) that the testimony of the State's key witness, Harold Torbett, included perjury or materially misleading statements of which the State was aware, and (2) that the State failed to disclose exculpatory evidence which was specifically requested and which would have materially aided the defense in impeaching Harold Torbett. Under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), if either of these claims are established a new trial would be required.

The State's response to this petition has rested entirely on procedural grounds. The State argues that, insofar as the trial court heard petitioner's claims at his new trial hearing and found no error, this Court is obligated to presume the correctness of those findings and dismiss the petition. To the extent that petitioner raises new evidence to support his petition, the State argues that he must first bring this evidence in state court and his failure to exhaust this remedy requires dismissal of the petition.[2] Before the Court can address the merits of the State's procedural arguments, an analysis of the facts underlying petitioner's claims and the merits of those claims must be addressed.

## FINDINGS OF FACT

One month before Bragan was indicted for the murder of Urice, Harold Torbett jumped bond the day he was to enter a plea. Torbett had a lengthy criminal record and was up on charges of burglary and receiving stolen property. Under the habitual criminal statute, which was attached to the stolen property count, he was facing a life sentence. The State had agreed to drop the stolen property and habitual criminal counts and let Torbett plead guilty to burglary. However, Torbett was not quite ready to serve his sentence so, when the court took its lunch break, he fled the state.

When Torbett was recaptured, he was facing the additional charge of fraudulent breach of trust. As fate would have it, he was placed in the same cell as Bragan and shortly thereafter went to the police with the story of Bragan's confession. Although Torbett was represented by counsel, his discussions with the police were conducted in secret without the knowledge or consent of his attorney.

Harold Torbett was the key witness for the prosecution. His testimony that Bragan confessed to the murder was the only direct evidence of Bragan's alleged partic-

---

**1.** Petitioner raised several issues in his petition, but has focused upon the *Brady* and *Giglio* claims since they appeared most meritorious. The Court chooses to address these two issues exclusively in this opinion since to consider the remaining issues would result in further delay. Because the Court finds that petitioner states successful *Brady* and *Giglio* claims, the Court grants the writ on these issues and reserves judgment on the remaining claims.

**2.** In the alternative, the State notes that petitioner may have procedurally defaulted in the state courts by failing to raise this new evidence within the statute of limitations period. Although this would satisfy the exhaustion requirements of habeas corpus, it would require petitioner to show cause and prejudice for the default. However, since the Court finds below that Torbett need not have brought the newly discovered evidence to the state courts in this instance, there has been no procedural default.

ipation in the crime. The rest of the State's case was based on circumstantial suspicions, many for which the defense proffered reasonable explanations. The prosecutor conceded that Torbett's testimony was "crucial in the case." (TR at 2049). Because of the critical nature of Torbett's information, special precautions were taken by the State. District Attorney Lanzo stated at the new trial hearing that he kept Torbett's testimony secret, and did not even reveal the information to Torbett's own attorney. Only three or four persons knew of Torbett's role in the case. During the trial, the prosecutors used a code name for Torbett when they spoke among themselves in earshot of others. For the purported fear that Torbett might be "silenced" in the penitentiary, the State postponed entering Torbett's plea until after his testimony at trial, a delay of over six months. (TR at 2052).[3]

An apparent typographical error in the prosecution's witness list sent defense investigators off of Torbett's track and defense counsel never had the opportunity to speak with Torbett before the trial. A "slip of the tongue" by the prosecutor further misled the defense team when the District Attorney reported that Torbett had escaped the day he was to enter his plea. This left defense counsel with two impressions: (1) that Torbett had not yet been apprehended and was therefore unavailable to testify, and (2) that the initial plea agreement was revoked due to Torbett's escape.

The defendant's belief that no plea agreement was pending with Torbett was further confirmed when, before the trial began, the prosecutor stated in open court that "there is no agreement with any particular witness at this point." (TR at 164). In opening argument, the State said its case "was going to be one of the toughest cases that the State has ever prosecuted.... the State's case is going to be [based on] circumstantial evidence." (TR at 249). Because of these statements, de-

fense counsel appeared to have been taken by complete surprise when Torbett was called to the stand and testified to Bragan's confession. (TR at 2029, 2047).

On direct examination of Torbett, prosecutors attempted to establish that despite Torbett's criminal history and pending charges, he had nothing to gain by testifying against Bragan and, if anything, had much to lose by becoming a "snitch." After determining that Torbett had been convicted of burglary in 1967 and 1968, charged with escape and larceny during his term of imprisonment, and in 1970 was convicted on two counts of armed robbery and receiving stolen property, (TR at 1158–59), the State asked Torbett about his pending charges.

Q: [by District Attorney Gerbitz] Now, you have some cases pending against you right now. Do you recall what the offenses are that you're charged with right now?

A: [Torbett] One burglary and larceny, and one receiving and concealing stolen drugs, breach of trust.

Q: All right, breach of trust. That's fraudulent breach of trust?

A: Yes, sir.

Q: *All right, and a habitual criminal statute is attached to one of those cases, is that right?*

A: Yes, sir.

(TR at 1159–60) (emphasis supplied).

Later in direct examination, the State elicited Torbett's claim that there was no agreement with regard to the charges pending against him.

Q: Now, Mr. Torbett, you're charged with some offenses here in Hamilton County right now. Has anything been promised you in regard to those charges against you for your testimony today here in court?

A: No, sir.

Q: Have you been promised to be protected?

---

3. The State offers no reason why Torbett could not have entered his plea before the Bragan trial and then placed in protective custody in the Hamilton County Jail. Instead, the State chose to continue Torbett's case on several occasions

until Bragan was finally convicted. Moreover, Torbett was not sent to the penitentiary as the State feared, but rather was sent to a low security workhouse where he was given a trustee position and later escaped.

A: No, sir.

Q: Have you been promised any leniency in the form of probation or parole, to reduce sentences?

A: No, sir.

(TR at 1179). In an attempt to unearth any agreement Torbett may have made with the State, on cross-examination, defense counsel pursued the following line of inquiry:

Q: [by Mr. Ruth] All right. Now, as I understand, you're a professional criminal?

A: Yes, sir.

Q: Charged with being an habitual criminal?

A: That's right.

Q: And those cases pending? Mr. Torbett, if you're convicted of those cases, you will go to prison for the rest of your natural life, isn't that correct?

A: Yes, sir.

. . . .

Q: You'd do about anything to get out of jail, wouldn't you?

A: No, sir.

Q: Anything. You say there have been no promises made to you?

A: No, sir.

Q: But a helluva lot of hope?

A: I hope for the best all the time.

. . . .

Q: You say if you're convicted on that habitual criminal count, you'll go to jail for the rest of your natural life?

A: Yes, sir.

(TR at 1181–82, 1185). Later in the cross-examination, defense counsel returned to the subject of Torbett's pending cases.

Q: [by Mr. Alt] And I think you answered Mr. Gerbitz's questions that you came here and you're testifying out of the goodness of your heart, is that true?

A: Yes, sir.

Q: And there's no promise of anything?

A: No, sir.

Q: And your trial's coming up later this month?

A: Yes, sir.

Q: And if it comes up and if Mr. Gerbitz proves his case against you, you'll go away for the rest of your life, is that right?

A: Yes, sir.

(TR at 1208–09).

After reading of Torbett's testimony in the newspaper, another prisoner, Ralph Janow, contacted defense counsel and reported that he had spoken with Torbett about the Bragan case. He claimed that Torbett admitted to a deal with the State whereby the habitual criminal charge pending against him would be dropped in exchange for the testimony. According to Janow, Torbett admitted that his testimony was fabricated.[4]

Janow's criminal history was remarkably similar to Torbett's. Both had several prior felony convictions, both were facing pending charges for burglary, both had habitual criminal counts attached to their pending charges, and both had made deals with the State to drop the habitual criminal count just prior to fleeing the jurisdiction. On cross-examination, the State brought out these similarities, as well as the fact that after Janow's escape, the plea agreement was called off.

Q: [by District Attorney Bevil] Mr. Janow, that case is still pending against Mr. Torbett, isn't it, the habitual criminal attached to it?

A: [Janow] Yes, sir, I think so.

Q: As far as you working undercover, the agreement was, sir, for you to work undercover for known big time criminals in Hamilton County?

**4.** At this Court's evidentiary hearing, petitioner called two witnesses who claimed to have met with Torbett recently. Edward Ley, a former parole officer, and Fred Steltemeier, a retired attorney, became interested in petitioner's claims and tracked down Torbett near Atlanta, Georgia. They claim that Torbett admitted to testifying falsely against Bragan in exchange for the dismissal of his habitual criminal count.

However, Torbett refused to return to Tennessee or swear an affidavit for fear of certain authorities in Chattanooga. The Court found both Mr. Ley and Mr. Steltemeier to be very credible witnesses, but the statements Torbett allegedly made to them are hearsay and cannot be considered by this Court in reaching its decision.

A: Yes, sir.

. . . .

Q: And this agreement, sir, was to drop this count if you would do this work, which—would have been dangerous work for you?

A: Oh, yes, sir.

. . . .

Q: All right, in exchange for your risking your life to catch these big time criminals, the agreement by the State was to drop the habitual criminal?

A: Habitual criminal, yes, sir.

Q: That agreement was made, was it not, sir, prior to the time that you left to go to California?

A: Yes, sir.

Q: So, when you left to flee out to California to hide out,—

A: (Interposing) That killed it.

(TR at 1403–04).

Finally, in closing arguments, the State reiterated Torbett's testimony. On three separate occasions, the prosecutor stated that Torbett faced life in prison. (TR at 1833, 1865, 1886). At one point, the prosecutor argued,

[t]he testimony from the stand is that the State of Tennessee has made no bargain with Mr. Torbett. The only testimony you've heard and the only thing the State has represented to you is that we will protect him and he will be processed like all other criminals, period. There is no proof to the contrary. He will be protected, period. *The State has not promised him that we would drop his habitual criminal or any other aspect of his case.* But the innuendoes and the sly arguments that the State is going to take care of him because he's going to help us. Well, he's not helping us at all.

(TR at 1886) (emphasis supplied).

Although it is clear from the trial record that defense counsel was informally told at one time of Torbett's February plea agreement, the statements and actions of the prosecutors gave defense counsel and the jury a distinct understanding that the plea agreement was off and that Torbett was facing a life term. Several significant facts lead to this conclusion. (1) Defense counsel had been told that Torbett escaped before the plea agreement was consummated. (2) The prosecutor stated in open court that no agreements had been made with any witnesses. (3) On direct examination, the State elicited from Torbett that the habitual criminal charges were still pending and that he faced a life sentence. (4) On cross-examination of Ralph Janow, whose criminal history was nearly identical to Torbett's, the State revealed that by escaping before a plea agreement was entered, an agreement was "killed." (5) In closing arguments, the prosecutor stated that no agreements had been made with Torbett and that the habitual criminal charges would not be dropped.

Faced with these statements, the defense counsel and the jury naturally concluded that no agreement was pending between Torbett and the State. Moreover, the jury was left with the impression that Torbett had nothing to gain from his testimony. This impression, which no doubt played an important role in assessing both Torbett's and Janow's credibility, was misguided. It was revealed after the trial, when Torbett entered a plea in October, 1977, that an agreement had been pending all the while and hung over Torbett's head as he testified against Bragan. The State explained his testimony as a misunderstanding. (TR at 2002).

According to the State, the plea agreement reached in February, before Torbett escaped, remained in force. At the new trial hearing held in January, 1978, the State characterized the situation as unique in that the State claimed to have determined, prior to the time that Torbett jumped bail, and prior to his discussions with prosecutors concerning Bragan, that it could not proceed on the habitual criminal count. The State claimed that its hands were tied since the count to which the habitual criminal charge was attached was invalid. Since the terms of the October plea were the same as the February agreement—an agreement made before the State even knew of Torbett's possible testimony—it was not made in exchange for his testimony and therefore, according to the

State, need not have been revealed to defense counsel and the jury.

The evidence introduced at this Court's evidentiary hearing, however, indicated that the State was not as helpless as they would have had the state court believe in regards to prosecuting the habitual criminal count. As a matter of Tennessee criminal law, the habitual criminal charge could have been transferred to the burglary count by resubmitting the case to the grand jury. The State was not required to honor any unfinalized plea agreement made in February due to Torbett's escape and indictment on new charges. This "plea agreement" was never put in writing and was not consummated until after Torbett gave his testimony.[5]

Upon entering his plea, Torbett was sentenced to a five to eight year term for burglary, and a three year sentence for fraudulent breach of trust. Despite his lengthy criminal record, Torbett was placed in the county workhouse where he was given a trustee position. Both his placement in the workhouse and his trustee status were extraordinary for a person with Torbett's criminal record and evidence adduced at the evidentiary hearing indicated that this could only have been achieved by having specific direction from the District Attorney's office or other authority. Less than a year later, Torbett escaped from the workhouse and no arrest warrant was ever issued. To this day, Torbett remains at large.

The evidence is clear that the District Attorney had discretion in Torbett's case to pursue the habitual criminal count. The State purposely postponed resolution of Torbett's case until after his testimony against Bragan, thereby holding over Torbett's head the possibility of life imprisonment. Prosecutors led defense counsel to believe that no agreement whatsoever had

been reached with Torbett, and so misled the jury as well by denying the existence of any deals and by claiming that Torbett faced life in prison. The proof further shows that once Torbett pleaded guilty, he was sent to a workhouse, given special status in a trustee position, and escaped within a year without an arrest warrant ever being issued. From all of these facts, the Court is persuaded, by the preponderance of the evidence, that the State and Torbett had at least an implicit understanding that in exchange for Torbett's testimony at trial, he would receive lenient treatment. The Court also finds by convincing evidence that under the State's own admissions, defense counsel and the jury were misled about Torbett's pending charges. Although it is evident that the defendant knew of Torbett's February plea agreement, the Court is convinced defense counsel believed the agreement was called off and not pending while Torbett testified.

## CONCLUSIONS OF LAW

The Court is faced with two grounds for relief arising from these facts. First, that the State failed to correct Torbett's false and misleading testimony that he had made no agreement regarding the habitual criminal count, and expressly ratified that false evidence in closing arguments, is a clear violation of *Giglio*. Second, that the State's failure to disclose to defense counsel and the jury its agreement with Torbett, whether or not it was quid pro quo, violated the requirements *Brady*. The Court finds both claims to be meritorious.

A. *Giglio–Napue* Claims.

█ It is a fundamental precept of the law that convictions may not be obtained through the use of false evidence.

[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under

---

**5.** At oral argument before Magistrate Judge Sandidge, the State admitted that the February plea agreement was not binding after Torbett's escape and was only reinstated some time later. So there was some misinformation apparently about the ... nature of Mr. Torbett's previous negotiations with the state. But at that time the deal was off because Mr. Torbett had

escaped. The deal was later ... concluded on exactly the same terms which were agreed upon before Mr. Torbett came forward and told the prosecution that he had any additional proof that he could offer in the Bragan case.

(November 9, 1990, TR at 19).

the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

*Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) (citations omitted). This principle was reaffirmed in *Giglio v. United States,* 405 U.S. 150, 153–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

█ In both cases, agreements had been reached between the State and a witness for the prosecution. In return for testimony beneficial to the State's case, witnesses were promised leniency in some form. In these cases, however, the witnesses falsely denied that any agreement had been struck and the prosecutor failed to correct this perjurious testimony. The Court recognized in both instances that disclosure of plea agreements may materially affect a jury's assessment of credibility since these agreements give the witness an incentive to testify favorably for the prosecution.

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in the concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

*Napue, supra,* 360 U.S. at 269, 79 S.Ct. at 1177. Therefore, the State is required to disclose "evidence of any understanding or agreement as to a future prosecution," *Giglio, supra,* 405 U.S. at 155, 92 S.Ct. at 766, and to correct false evidence when it appears. *Napue, supra,* 360 U.S. at 269, 79 S.Ct. at 1177. See also *Perkins v. Le-Fevre,* 642 F.2d 37, 40 (2d Cir.1981); *United States v. Bigeleisen,* 625 F.2d 203, 207 (8th Cir.1980); *Ross v. Heyne,* 483 F.Supp. 798, 801 (N.D.Ind.), *aff'd in part, rev'd in part,* 638 F.2d 979 (7th Cir.1980). To suc-

ceed on a claim that the government used false testimony to gain a conviction, the petitioner must establish (1) that the State knowingly used, or failed to correct, false evidence, and (2) that the false evidence was material. *Giglio, supra,* 405 U.S. at 153–54, 92 S.Ct. at 766.

**1. *Torbett's False and Misleading Testimony.***

█ Torbett testified on direct examination that there were no agreements made between him and the District Attorney with regard to his pending charges. He held fast to the claims that there were no promises of leniency made by the State in exchange for his testimony, that he faced life in prison under the habitual criminal count, and that he only hoped for the best. These statements, solicited by the District Attorney and reiterated to the jury during closing arguments, were false. The Court is persuaded that some "understanding" between the State and Torbett had been reached prior to the Bragan trial. This understanding was never reduced to writing and was made in secret, negotiations having taken place without the knowledge of Torbett's attorney. In exchange for the testimony, the State apparently agreed to give Torbett special consideration. His case was disposed of as if he had never escaped. It is clear that Torbett, a professional criminal, also received special treatment by being placed at the county workhouse in a trustee position, and by escaping shortly thereafter with never an arrest warrant issued.

Courts have consistently held false testimony regarding the absence of such arrangements to violate the rudimentary demands of justice and require a new trial if the perjury was material to the case. *Giglio, supra,* at 153, 92 S.Ct. at 766. See *United States v. Bigeleisen,* 625 F.2d 203, 207–08 (8th Cir.1980); *United States v. Barham,* 595 F.2d 231, 242–44 (5th Cir. 1979), *cert. denied,* 450 U.S. 1002, 101 S.Ct. 1711, 68 L.Ed.2d 205 (1981); *United States v. Anderson,* 574 F.2d 1347, 1355 (5th Cir. 1978); *United States v. Butler,* 567 F.2d 885, 891 (9th Cir.1978); *United States ex rel. Wilson v. Cannon,* 538 F.2d 1272, 1277

(7th Cir.1976); *Armour v. Salisbury,* 492 F.2d 1032, 1037 (6th Cir.1974); *Levin v. Katzenbach,* 363 F.2d 287, 290 (D.C.Cir. 1966).

■ Even if this Court was not convinced that the State had made promises to Torbett in exchange for his testimony, petitioner's claim would still have merit since even the State admits that some arrangements had been made to drop the habitual criminal count. Courts have granted petitioners relief when key prosecution witnesses, although not technically committing perjury, left the jury with a materially false impression. Thus, misleading statements made by a witness or the prosecutor, which have a material impact upon the jury's deliberations, violate the dictates of *Giglio* in the same way as outright perjury. See *United States v. Bagley,* 473 U.S. 667, 684, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985) ("technically correct" but misleading information provided by prosecution); *United States v. Polizzi,* 801 F.2d 1543, 1550 (9th Cir.1986) (truthfulness of witness's ambiguous testimony matter of "unanswerable semantics"); *United States v. Iverson,* 637 F.2d 799, 805 n. 19 (D.C.Cir. 1980), *modified,* 648 F.2d 737 (1981) ("it makes no difference whether the testimony is technically perjurious or merely misleading"); *United States v. Bigeleisen,* 625 F.2d 203, 208 (8th Cir.1980) ("misleading argument"); *United States v. Barham,* 595 F.2d 231, 243 n. 17 (5th Cir.1979) ("misleading" answers reinforced by prosecutor); *United States v. McClintic,* 570 F.2d 685, 692 (8th Cir.1978) (failure of government to correct "misleading impression" regarding witness' pending charges); *United States v. Anderson,* 574 F.2d 1347, 1355 (5th Cir.1978) (prosecutor allowed "jury to be presented with a materially false impression"); *United States v. Butler,* 567 F.2d 885, 891 (9th Cir.1978) (witness paraded himself in "false colors"); *Boone v. Paderick,* 541 F.2d 447, 450 (4th Cir.1976), *cert. denied,* 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977) (testimony which "skirts the edge of perjury"); *Armour v. Salisbury,* 492 F.2d 1032, 1037 (6th Cir.1974) ("misleading information"); *Levin v. Katzenbach,* 363 F.2d 287, 290 (D.C.Cir.1966) (presenting "false picture" of the facts); *Scott v. Foltz,* 612 F.Supp. 50, 57 (E.D.Mich.1985) (jury "clearly misled" concerning witness' plea agreement); *United States v. Stifel,* 594 F.Supp. 1525, 1539 (N.D.Ohio 1984) ("materially misleading" testimony); *United States ex rel. Dowd v. Lane,* 574 F.Supp. 972, 974–75 (N.D.Ill. 1983), *aff'd,* 762 F.2d 1015 (7th Cir.1985) (failure of prosecutor to correct testimony he knew was "likely to convey a false impression to the jury" and "deliberately emphasized the testimony by repeating it").[6]

Even if, as the State claims, the plea agreement was not a quid pro quo for the Bragan testimony, the prosecutor's questions and closing argument, coupled with Torbett's answers, undoubtedly misled the jury about Torbett's pending charges. The jury was led to believe that no agreements whatsoever had been struck and that Torbett was facing trial on charges which could result in life imprisonment. Prosecutors used this fact to neutralize defense counsel's attacks on Torbett's credibility—since there were no agreements, he had nothing to gain. Whether or not any promises were made to Torbett for his testimony, the District Attorney admitted at the new trial hearing that the State and Torbett had reached an agreement to drop the habitual criminal count. Torbett did not face life in prison. Moreover, he never spent a day in the penitentiary.

---

**6.** Taking as true the State's claim that the plea bargain was not made in exchange for Torbett's testimony, on careful reading of Torbett's testimony and the prosecutor's closing argument, one could argue that the evidence presented was not perjurious. The questions posed to Torbett centered on whether a quid pro quo bargain had been struck, rather than any bargain whatsoever. Since the plea had not been consummated at the time of trial, it would be technically correct to say that Torbett still faced life in prison under the habitual criminal charge. However, according to the State, at the time of trial they were bound to the February plea agreement and the habitual criminal count could not have been brought under the indictment. Therefore, one must walk a very fine line to conclude that Torbett's testimony was truthful.

The State stresses that the plea agreement was in force months before they knew of Torbett's usefulness and therefore should have no impact upon the jury's credibility assessment. However, as discussed above, the February plea agreement was not binding upon the State. The habitual criminal count could have been attached to another count of the indictment if the State believed the receiving stolen property count was invalid. Torbett, being a professional criminal, would have known of this possibility and therefore had every incentive to curry favor with the prosecution.[7] Knowing that the State's agreement to drop the habitual criminal charge was not binding, and due to the State deliberate choice to continue Torbett's case until after the Bragan trial, Torbett testified under fear of life imprisonment. Therefore, the misleading evidence and argument made to the jury constituted constitutional error. If this error was material to the case, Bragan must receive a new trial.

### 2. *Materiality.*

▆ The standard for determining materiality of false or misleading evidence was set forth in *Giglio.* The Court there observed that "[a] new trial is required if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury.'" 405 U.S. at 154, 92 S.Ct. at 766 (quoting *Napue, supra,* 360 U.S. at 271, 79 S.Ct. at 1178). Although this test has been restated in a number of ways, "the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). The Court observed in *United States v. Bagley,* 473 U.S. 667, 679–80, 105 S.Ct. 3375, 3382, 87 L.Ed.2d 481 (1985), that the test "may as easily be stated as a materiality standard under which the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt."

Applying this standard to the case at hand, the Court finds that the false and misleading testimony and argument presented by the prosecution was material. Although the State introduced much circumstantial evidence, the single most incriminating witness was Torbett. Torbett's testimony that Bragan confessed to the murder was the only direct evidence linking Bragan to the crime. Torbett was the State's key witness and was crucial to the prosecution's case. Had the jury been apprised of the tenuous plea agreement the District Attorney held over Torbett's head as he testified, whether or not it was explicitly made in exchange for the testimony, the verdict may well have been different.[8]

---

7. The State also attempts to explain away Torbett's admittedly misleading testimony on the grounds that he did not understand that the February plea agreement remained in force. (TR at 2002). This argument is more counterproductive than beneficial to the State's cause. Several courts have observed that a witness' credibility is even more questionable when he is unsure of a plea agreement. Because of this uncertainty, the witness is more likely to believe his testimony to be critical to the outcome of pending charges and will therefore be more interested in pleasing the prosecution. *United States v. Bagley,* 473 U.S. 667, 683, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985); *United States v. Roan Eagle,* 867 F.2d 436, 443 (8th Cir.), *cert. denied,* 490 U.S. 1028, 109 S.Ct. 1764, 104 L.Ed.2d 199 (1989); *Campbell v. Reed,* 594 F.2d 4, 7 (4th Cir.1979); *Boone v. Paderick,* 541 F.2d 447, 451 (4th Cir.1976); *United States v. Turner,* 490 F.Supp. 583, 602 (E.D.Mich.1979), *aff'd,* 633 F.2d 219 (6th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981).

It is odd that the State argues Torbett's misstatements were the result of a misunderstanding when the misstatements at issue were literally put in Torbett's mouth by the prosecutor on direct examination, and later repeated in closing argument. Even if Torbett did not understand the February plea agreement, the District Attorney did, but failed to correct this misunderstanding which was presented to the jury as fact.

In any event, it appears that Torbett did know of the plea bargain. Torbett's attorney testified at the new trial hearing that he had discussed the February agreement with Torbett during the summer of 1977 while Bragan was awaiting trial.

8. "It is inconceivable that evidence of perjury would not, as an objective matter, affect a factfinder's assessment of a witness' credibility."

The failure to correct this false and misleading testimony was not, therefore, "harmless beyond a reasonable doubt."

### B. *Brady* Claim.

■ The Supreme Court in *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), held that "the suppression by the prosecution of evidence favorable to an accused upon request violated due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Thus, in order to state a successful claim under *Brady,* a petitioner must establish that (1) the prosecution suppressed favorable evidence, and (2) the evidence was material to the defense.

### 1. *Suppression of Impeachment Evidence.*

■ Included among the favorable evidence the State is required to disclose is information relating to the reliability of prosecution witnesses. Thus, information concerning any agreements or understandings reached between witnesses and the State must be disclosed under the rule. *Giglio, supra,* 405 U.S. at 154, 92 S.Ct. at 766; *United States v. Buchanan,* 891 F.2d 1436, 1443 (10th Cir.1989), *cert. denied,* 494 U.S. 1088, 110 S.Ct. 1829, 108 L.Ed.2d 958 (1990); *Reutter v. Solem,* 888 F.2d 578, 582 (8th Cir.1989); *Haber v. Wainwright,* 756 F.2d 1520, 1523 (11th Cir.1985); *Thomas v. Cardwell,* 626 F.2d 1375, 1381 (9th Cir. 1980).

Courts have required the disclosure of all agreements reached between prosecution witnesses and the State, even if the agreements were not binding, involved an unrelated matter, or were not expressly made in exchange for the testimony at trial. The court in *Haber v. Wainwright,* observed that "*Giglio* did not speak in terms of the state's duty to disclose only bona fide enforceable grants of immunity. Its reach extends to '*any* understanding[s] or agreement[s].'" 756 F.2d at 1524 (quoting *Giglio, supra,* 405 U.S. at 155, 92 S.Ct. at 766)

*Bagley v. Lumpkin,* 798 F.2d 1297, 1301 (9th

(emphasis in original). The Sixth Circuit has held that

> a state prosecutor may not avoid his disclosure requirements under *Brady* ... merely by claiming that in his view the suppressed evidence was neutral and not exculpatory.... [W]here information has been specifically requested by the defense, the subjective evaluation of that information's evidentiary value is not for the prosecutor to make.

*Campbell v. Marshall,* 769 F.2d 314, 318 (6th Cir.1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1268, 89 L.Ed.2d 576 (1986). See also *Jones v. Jago,* 575 F.2d 1164, 1168 (6th Cir.), *cert. denied,* 439 U.S. 883, 99 S.Ct. 223, 58 L.Ed.2d 196 (1978).

■ The State must disclose all agreements struck with witnesses, even agreements which are not on a quid pro quo basis, since this evidence may be highly relevant to the jury's deliberation. *United States v. Turner,* 490 F.Supp. 583, 605 (E.D.Mich.1979), *aff'd,* 633 F.2d 219 (6th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). See also *Reutter v. Solem,* 888 F.2d 578, 582 (8th Cir.1989); *Bagley v. Lumpkin,* 798 F.2d 1297, 1302 (9th Cir.1986); *United States v. Shaffer,* 789 F.2d 682, 689 (9th Cir.1986); *Breest v. Perrin,* 624 F.2d 1112, 1116 n. 3 (1st Cir.), *cert. denied,* 449 U.S. 1020, 101 S.Ct. 585, 66 L.Ed.2d 481 (1980); *United States v. Pope,* 529 F.2d 112, 114 (9th Cir. 1976); *United States v. McCrane,* 527 F.2d 906, 911–12 (3d Cir.1975), *vac'd on other grounds,* 427 U.S. 909, 96 S.Ct. 3197, 49 L.Ed.2d 1202 (1976), *aff'd on remand,* 547 F.2d 204 (3d Cir.1976); *United States v. Buendo,* 701 F.Supp. 937, 943 (D.Mass. 1988), *aff'd sub nom. United States v. Penta,* 923 F.2d 839 (1st Cir.1990).

■ In this case, the Court finds that the State reached an agreement with Torbett in exchange for the testimony against Bragan. Not only was this agreement not disclosed to defense counsel despite a specific request, but the District Attorney, on the first day of trial and in closing argument, denied that any agreement had been

Cir.1986).

made with any witness.[9] The statements made by the State to defense counsel, the court, and the jury, indicate a purposeful decision to hide the Torbett plea agreement until after the Bragan trial. Even assuming that the agreement was not made in exchange for the testimony, the agreement was highly relevant to Torbett's credibility. Since it was not binding, Torbett had a strong motive to assist the State in any way he could. The Court therefore finds that the State knowingly suppressed evidence favorable to the defense. Thus, if the failure to disclose the agreement was material, petitioner must receive a new trial.

2. *Materiality.*

█ The test for materiality in cases of undisclosed exculpatory evidence was clarified by a plurality of the Court in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). See *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987). The *Bagley* Court set forth two rules. When the prosecutor "knowingly [fails] to disclose that testimony used to convict the defendant was false ... [the conviction] 'must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Bagley, supra,* 473 U.S. at 678, 105 S.Ct. at 3375 (quoting *Agurs, supra,* 427 U.S. at 103, 96 S.Ct. at 2397). As for all other situations, the failure to disclose exculpatory evidence requires the court to determine from the totality of the circumstances whether there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682, 105 S.Ct. at 3383.

Since the Court finds that Torbett did present false evidence by denying the existence of an agreement with the State, petitioner must receive a new trial if this false testimony could have affected the judgment of the jury. Stated another way, only if the perjurious testimony was harmless beyond a reasonable doubt can Bragan's conviction stand. *Id.* at 680, 105 S.Ct. at 3382. From a review of the evidence introduced at trial and the crucial nature Torbett's credibility played in Bragan's conviction, the Court concludes that the nondisclosure of any understandings Torbett and the State had reached was not harmless beyond a reasonable doubt.[10]

█ The nondisclosure of the plea agreement, whether or not it was quid pro quo, mandates a new trial. Torbett's testimony that he faced life in prison, and the District Attorney's claim in closing argument that Torbett still faced the habitual criminal count, would have been false even if there was no quid pro quo arrangement between the State and Torbett. The State asserted after the trial that the February plea agreement remained in effect, yet denied its existence before judge and jury at Bragan's trial. Assuming that the February agreement had remained in effect, and Torbett had not explicitly been promised anything for his testimony, its nondisclosure was still material.[11]

9. On July 28, 1977, defense counsel filed a number of motions, one of which was entitled "Motion to Produce State's Agreements with Witnesses." That motion asked for "any agreements by the State relating to favorable treatment *or otherwise* regarding any prospective State's witness." (emphasis added). In response, District Attorney Lanzo stated in open court on September 7, 1977, that "there is no agreement with any particular witnesses at this point." (TR at 164). In direct contradiction to the State's position at the new trial hearing, the District Attorney told the jury in closing argument that "[t]he State has not promised [Torbett] that we would drop his habitual criminal, or any other aspect of his case." (TR at 1886).

10. Compare *United States v. Presser,* 844 F.2d 1275, 1282 (6th Cir.1988) ("the failure of the prosecution to disclose to the defense that the prosecution's key witness had personal interests at stake when they testified during the trials was material evidence which should have been disclosed pursuant to the *Brady* doctrine").

11. Consider *United States v. Starusko,* 729 F.2d 256, 261 (3d Cir.1984) (Evidence "which affects the credibility ... [of a key prosecution witness] is material for impeachment purposes. It is 'obviously of such substantial value to the defense that elementary fairness requires it to be disclosed.' ") (quoting *Agurs, supra,* 427 U.S. at 110, 96 S.Ct. at 2401).

As discussed above, courts have recognized that nonbinding agreements and implicit understandings can be very relevant in assessing a witness' credibility. The State admitted at the new trial hearing that Torbett's testimony may have been misleading because Torbett did not fully understand that the February agreement was still in effect. However, Torbett's uncertainty with regard to the status of his pending charges only makes his testimony more suspect since he would be more interested in pleasing the prosecutors who would be determining his fate. Torbett would have known that the February plea agreement was no longer binding upon the prosecutors and that he could be reindicted on the habitual criminal count. Rather than removing this uncertainty by having Torbett enter his plea prior to Bragan's trial, the State purposely postponed the plea until after his testimony. Thus, the tenuous plea agreement the State admits to have been in existence during trial would have been extremely relevant to Torbett's credibility. Had defense counsel known of this fact and exploited it on cross-examination, the jury might have believed Janow's claim that Torbett fabricated his testimony to ensure the habitual criminal count was dropped.[12] This evidence was therefore material and its nondisclosure clearly violated the Fourteenth Amendment.[13]

## PROCEDURAL ISSUES

 The State's response to petitioner's claims asserts two procedural grounds for

denying the petition. First, the State maintains that since the state court findings of fact are to be presumed correct, this Court is obligated to find that no error occurred in petitioner's trial. Second, the State asserts that petitioner has not properly exhausted his claims.[14]

### A. Presumption of Correctness.

On habeas review, state court findings of fact are entitled to a presumption of correctness by federal courts. This presumption was established in 28 U.S.C. § 2254(d), which provides in relevant part as follows:

In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, *evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—*

. . . .

(8) . . . that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the

---

**12.** The fact that defense counsel vigorously attacked Torbett's credibility by using his prior criminal record and implying that a deal may have been struck does not render the undisclosed plea agreement immaterial. "[T]he fact that the jury was apprised of other grounds for believing that the witness ... may have had an interest in testifying against petitioner [does not] turn[ ] what was otherwise a tainted trial into a fair one." *Napue, supra,* 360 U.S. at 270, 79 S.Ct. at 1177. See also *United States v. Perdomo,* 929 F.2d 967, 972 (3d Cir.1991); *United States v. Nacrelli,* 543 F.Supp. 798, 800 (E.D.Pa. 1982).

**13.** The Court believes that even under the stricter test for materiality applied by the *Bagley* Court for simple nondisclosure cases, the failure to inform defense counsel of the plea arrangement was material. Given the crucial nature of

Torbett's testimony and the obvious interest Torbett had in pleasing the District Attorney, the Court concludes that there is a reasonable probability that, had this information been disclosed to the defense, the result of the proceeding would have been different.

**14.** Although this petition was filed 10 years after the conviction became final, the State has not argued prejudicial delay under Rule 9(a) of the Rules Governing Section 2254 Cases. Prejudicial delay is an affirmative defense that is waived if not properly pleaded. *Hillery v. Sumner,* 496 F.Supp. 632, 634–36 (E.D.Cal.1980). See also 1 James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 23.2, at 327 n. 13 (1988). Accordingly, since prejudicial delay has not been raised in any responsive pleading, respondent has waived this defense.

sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and *the Federal court on consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:*

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, ... *unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination,* the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

(emphasis supplied).

■ There are three reasons why this Court makes its own findings of fact rather than presuming the correctness of the state court's findings. First, the issues in this petition involve mixed questions of law and fact to which the presumption of correctness does not apply. Second, the state court's "findings of fact" are too conclusory to benefit from the presumption of correctness. Third, the state court's findings are not fairly supported by the record and therefore the presumption is not binding upon this Court.

### 1. *Mixed Question of Law and Fact.*

The presumption of correctness codified in 28 U.S.C. § 2254(d) applies only to purely factual determinations made by the state court. Questions of law are resolved *de novo* by the federal court. In many circumstances, it is difficult to separate factual findings from legal conclusions, and so these "mixed questions of law and fact" are freely reviewable by the federal court as well. *Smith v. Jago,* 888 F.2d 399, 407 (6th Cir.1989).

The *Brady* and *Giglio* issues raised by petitioner include mixed questions of law and fact. The Court is called upon to determine whether the statements made by the witnesses and the State during trial were materially false or misleading and whether information kept from the defendant was material. Assessing materiality under these circumstances requires a review of the trial and the application of legal principles. As such, materiality is a mixed question and courts have consistently held that the presumption of correctness has no application to this issue. *United States v. Perdomo,* 929 F.2d 967, 969 (3d Cir.1991); *United States v. Buchanan,* 891 F.2d 1436, 1440 (10th Cir.1989); *United States ex rel. Shaw v. De Robertis,* 755 F.2d 1279, 1282 n. 2 (7th Cir.1985); *Chaney v. Brown,* 730 F.2d 1334, 1345–46 (10th Cir.), *cert. denied,* 469 U.S. 1090, 105 S.Ct. 601, 83 L.Ed.2d 710 (1984); *Davis v. Heyd,* 479 F.2d 446, 451 (5th Cir.1973). Whether evidence is exculpatory and whether the disclosure of evidence to the defense was adequate are also a mixed questions since they similarly call for legal conclusions. Therefore the presumption of correctness in this instance would only apply to determinations of what was disclosed to the defense and what agreements existed between Torbett and the State. The state court, however, made no express findings on these issues. As discussed below, the findings are too conclusory to determine what findings were actually made.

### 2. *Inadequacy of State Court Findings.*

Although this Court is to presume the correctness of state court findings of fact, no explicit findings were made concerning Torbett's plea agreement and disclosure of that agreement to defense counsel. The entire "findings of fact," which were delivered from the bench at the conclusion of the new trial hearing, consist of the following sentence: "Firstly, in regard to the matters testified to, in connection with Torbett, I do find this fact: that there was no misleading of the defendant, or misrepresentation to the defense counsel, and find further as fact that there was no failure to disclose exculpatory evidence." (TR at 2104). This conclusory statement gives the Court no means of sorting out findings of fact and conclusions of law.

The transcript of the trial itself indisputably documents misleading statements, however, it appears that the state court found them to be immaterial—a finding not subject to the presumption of correctness. Furthermore, the conclusion that "there was no failure to disclose exculpatory evidence" presumes the resolution of a mixed legal/factual question. Therefore, the Court is unable to determine from these "findings" which facts are to be presumed correct.

For state court findings to be presumed correct, Section 2254(d) requires in all cases that those facts be "evidenced by a written finding, written opinion, or other reliable and *adequate* written indicia." (emphasis supplied). When, as here, "the state court did not explore in any detail the factual underpinnings of the claim or the possible prejudicial impact of the alleged constitutional violations, it is entirely proper for the district court to make its own assessment of the facts and apply the appropriate governing principles." *Perkins v. LeFevre*, 642 F.2d 37, 41 n. 3 (2d Cir.1981). See also *Fowler v. Jago*, 683 F.2d 983, 990–91 (6th Cir.1982), *cert. denied*, 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 363 (1983). A federal court must make its own findings of fact when the state court determination is conclusional, fails to indicate the factual basis for its conclusion, or when the state findings do not address or resolve all of the controlling factual issues. 1 James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 20.3, at 281 & nn. 58–59 (1988 & Supp.1991) (citing cases).

The state judge made no finding regarding Torbett's plea agreement or what information was actually disclosed to defense counsel. Accordingly, this Court is free to make its own findings on these issues. The single conclusory sentence stating the trial judge's "findings" does nothing more that assert the belief that there was no error in the trial. Because these findings are wholly inadequate and conclusional, they cannot be presumed correct.

### 3. *State Findings Not Supported by the Record.*

Under 28 U.S.C. § 2254(d)(8), the Court may disregard state court findings of fact which are not fairly supported by the record. The statements made by Torbett and the District Attorney at trial, preserved in the transcript, were misleading even assuming that the trial judge believed everything District Attorney Lanzo asserted at the new trial hearing. The District Attorney claimed to have been unable to proceed on the habitual criminal count, yet solicited from Torbett on the stand that that count remained viable, and argued to the jury in closing argument that Torbett may be convicted on that count. This was clearly misleading on its face and whether that evidence was material is a question of law to be decided by this Court.

The Court is also persuaded, by convincing evidence, that the state court erred when it concluded that defense counsel was not misled regarding Torbett's pending plea agreement. The very facts discussed above indicate clearly that the District Attorney's actions and statements before and during trial sent but one message to defense counsel—that Torbett's plea agreement had been called off due to his escape.[15] That defense counsel was misled

---

15. A similar factual situation was addressed by the Supreme Court in *United States v. Bagley*, 473 U.S. 667, 684, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985). The Court observed that

> an incomplete response [by the Government] to a specific request [for information] not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued.

In *Bagley*, defense counsel asked the prosecutor to disclose any inducements that had been made to witnesses, and the prosecutor failed to disclose that the possibility of a reward had been held out to two witnesses if the information they supplied led to "the accomplishment of the objective sought to be obtained ... to the satisfaction of [the Government]." *Id.* at 683, 105 S.Ct. at 3384. The Court concluded that the prosecutor's failure to disclose this information had the natural effect of misleading defense counsel into believing the witnesses testified without any inducement.

was even admitted by the State during hearings held before the Magistrate.[16]

Further evidence of inattention to detail in this matter can be seen from the appeals court opinion. The appellate court stated that

> Torbett's testimony that he still faced the habitual criminal charge was elicited by the defense on cross-examination to weaken his testimony that he had received *no promise of leniency*. The charges against him had not been disposed of, and to the extent that he misunderstood the charges with which he was faced, the appellants were assisted in casting doubt on his testimony.

*Bragan v. Tennessee*, No. 610, at 8 (Tenn. Crim.App. filed January 18, 1979). This statement is simply incorrect. That Torbett still faced the habitual criminal charge was elicited on direct examination by the prosecutor. Moreover, an incorrect legal standard is applied by the appellate court in this statement. The court mistakenly assumes that the ability of the defense to impeach Torbett on other grounds renders the nondisclosure of the agreement harmless. Moreover, the jury was never made aware of this alleged "misunderstanding" of Torbett's and therefore the defendant was not "assisted in casting doubt on his testimony."

From all of these factors, the Court finds that the presumption of correctness does not limit this Court's ability to find the relevant facts in this case.

Even assuming defense counsel was aware of the pending plea agreement, this finding has little relevance in this case. First, defense counsel was unaware that the agreement was made in exchange for Torbett's testimony. Since the state court made no finding on this issue, this Court's finding controls.

Second, the misleading statements made by the prosecutor to the jury are sufficiently prejudicial to constitute material error warranting a new trial. Thus, *even if defense counsel should have exposed the plea agreement*, the District Attorney's denial of that agreement before the jury would require the issuance of the writ.

Finally, several courts have noted that even when the defendant is aware of such exculpatory evidence but fails to raise it during trial, the prosecutor still has the duty to inform the jury.

## B. Exhaustion.

The State argues that petitioner has not exhausted his claims because he has not given the state courts an opportunity to pass on his newly discovered evidence. The exhaustion requirement of 28 U.S.C. § 2254 requires a habeas petitioner to " 'fairly present[ ]' to the state courts the 'substance' of his federal habeas corpus claim." *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 277–78, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971)). A claim has not been exhausted when newly discovered evidence presented in the federal petition, which has not been presented to the state courts, "places [the] claim in a significantly different posture." *Sampson v. Love*, 782 F.2d 53, 55 (6th Cir.), *cert. denied*, 479 U.S. 844, 107 S.Ct. 159, 93 L.Ed.2d 98 (1986). Put another way, when new evidence "fundamentally alter[s] the legal claim already considered by the state courts," the petition must be remitted for consideration of that evidence. *Vasquez v. Hillery*, 474 U.S. 254, 260, 106 S.Ct. 617, 622, 88 L.Ed.2d 598 (1986).

The only evidence presented by petitioner to this Court which was not substantially available to the trial court, is Torbett's alleged recantation and the proof that Torbett was given special status in the county workhouse and escaped without an arrest warrant being issued. Evidence that Torbett admitted to a secret deal with the State is not admissible since it is hearsay. Thus, the failure to present this evi-

The prosecutor may not allow false evidence to go uncorrected. *Napue, supra,* 360 U.S. at 269–70, 79 S.Ct. at 1177; *Perkins v. LeFevre,* 642 F.2d 37, 40 (2d Cir.1981); *United States v. Bigeleisen,* 625 F.2d 203, 207 (8th Cir.1980); *Scott v. Foltz,* 612 F.Supp. 50, 55 (E.D.Mich.1985); *Ross v. Heyne,* 483 F.Supp. 798, 801 (N.D.Ind.1980).

16. Before Magistrate Judge Sandidge, the State admitted that "there was some misinformation [provided to defense counsel] apparently about the ... nature of Mr. Torbett's previous negotiations with the state. But at that time the deal was off because Mr. Torbett had escaped." (November 9, 1990, TR at 19). The respondent's admission in this regard serves to nullify the presumption of correctness on this finding.

dence to the state court is not relevant for exhaustion purposes. Although the evidence concerning Torbett's special status and escape is relevant to petitioner's claim, it is not sufficiently compelling to require petitioner to first bring it in state court. The decision of this Court to grant the writ is based on the facts available to the state court. The newly discovered evidence is useful, but certainly does not "fundamentally alter" the claims presented below. Accordingly, the Court finds that petitioner has exhausted his claims.

### CONCLUSION

For the foregoing reasons, the Court finds that the State failed to disclose exculpatory evidence to the defendant and failed to correct materially false and misleading statements made at trial by prosecutors and the State's key witness. Accordingly, the Court grants the petition and orders respondent to release the petitioner from custody if petitioner is not provided a new trial within sixty (60) days from the entry of the Court's Order.

An Order consistent with the reasoning herein will be filed simultaneously with this Memorandum.